**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **CYNTHIA QUEER,** ) | **CASE NO. 5:10 CV 2540** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **JUDGE DONALD C. NUGENT** |
| ) | |
| **PNC BANK FKA** ) | |
| **NATIONAL CITY BANK,** ) | |
| ) | |
| Defendants. ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, PNC Bank, National Association ("Defendant" or "Bank").[1] (Docket #26.) Defendant seeks summary judgment as to Plaintiff, Cynthia Queer's claims for age, gender and disability discrimination and retaliation filed pursuant to the Ohio Civil Rights Act, Ohio Rev. Code § 4112, et seq. As noted in her Opposition Brief, Plaintiff will not pursue her claims for retaliation, age and disability discrimination. Therefore, the Court will only address the merits of Plaintiff's gender discrimination claim.

**I.    Factual Background**.

Plaintiff was hired by the Bank on September 7, 2005 as the Office Manager of its Chapel Hill Branch ("the Branch"). Deposition of Cynthia Queer ("Queer Depo.") at pp. 8-9; 19

---

[1]   Defendant notes that it is incorrectly identified in the Complaint as "PNC Bank FKA National City Bank." Plaintiff does not appear to disagree.

and 22; Complaint at ¶¶ 1 and 5. Plaintiff was interviewed by several people, including Brian Sargent, the Branch Manager of the Chapel Hill Branch. Sargent and Plaintiff were both supervised by District Manager Drew Martin.[2] Deposition of Drew Martin ("Martin Depo.") at p. 6. Plaintiff was 49 years old when she was hired and had nearly 16 years of banking experience. Queer Depo. at p. 20. Upon being hired, Plaintiff completed several different types of bank-mandated training. Id. at pp. 23-25.

As Office Manager, Plaintiff's duties included handling walk-in customers and customer concerns; opening new accounts; credit card accounts; selling personal loans; scheduling tellers; coaching tellers; assisting tellers; and, attending to audit issues. Queer Depo. at p. 40; Deposition of Brian Sargent ("Sargent Depo.") at p. 19. Plaintiff was also responsible for setting up "Work Perk" presentations with local businesses to promote the Bank's products. Queer Depo. at pp. 40, 117-19. The Bank set monthly sales goals for the Branch and Sargent divided the goals among the employees. Sargent Depo. at p. 13. For example, Plaintiff initially had a monthly goal of five Work Perk presentations per month and five new loans. Plaintiff was also expected to call potential customers to establish a "pipeline" of new business. Id. at pp. 46, 102-03.

### A. Branch Performance and the March 2006 Audit.

When Plaintiff was hired, the Branch was understaffed. Sargent Depo. at pp. 7-9.

---

[2] Sargent, Plaintiff and one other employee, John Alm, made up the "desk," as opposed to tellers who worked behind the teller line. Sargent Depo. at pp. 13-14. Alm was a licensed financial advisor and spent fifty percent of his time performing financial advisor duties and fifty percent of his time handling banking matters. Id. He regularly met his goals and did not have to work the teller line. Id. at 15-16. Plaintiff does not go into any further detail regarding Alm.

Plaintiff was required to work the "teller line" more often than she expected and told Sargent that she had trouble meeting her monthly goals because she worked the teller line. Queer Depo. at pp. 40-42; 102-03. Sargent Depo. at pp. 7-9, 16-17. During this time, Sargent performed many of Plaintiff's Office Manager duties. Queer Depo. at pp. 42, 58-59; Sargent Depo. at p. 69.

The Branch was audited in March 2006 and received a 76%, a failing result. On March 13, 2006, Sargent received a Performance Improvement and Directive Counseling as a result of the failed audit. Sargent Depo. Exhibit 3. The Directive Counseling reads as follows:

> An audit was conducted at the Chapel Hill Branch on Tuesday, March 7th, 2006 and a discrepancy was noted in a surprise audit of Brian's cash box. This discrepancy was minor in size ($10), but due to the existence of the discrepancy during a surprise audit is serious in nature. Brian must ensure that he and his branch follow company policies in regards to adherance [sic] to operational and policy standards. Other items of a serious nature emerged during the recent audit (March 7th, 2006) and must be addressed immediately. Brian is responsible for ensuring correction and future audit success.
>
> The Directive Counseling required the following:
>
> Brian must ensure adherance [sic] to bank policies as it relates to operations, regulatory compliance and procedures.
>
> Brian must ensure that the findings of the most recent (March 7, 2006) audit are corrected and mitigated.

Id.

Sargent testified that during an audit, the Bank ensures that the tellers are at drawer limits; things have been processed correctly; and, that accounts have been opened correctly. Sargent Depo. at p. 65. One of the serious issues noted on the March 2006 audit was that the tellers did not close the door to the teller line. Sargent Depo. at p. 64. The Branch had 90 days to correct the deficiencies noted in the March 2006 audit. Sargent Depo. at p. 55. Although attending to audit issues was included in Plaintiff's job description, Plaintiff testified during

-3-

deposition that correcting the deficiencies noted in the audit also impacted her ability to meet her goals.

### B. Plaintiff's Job Performance and Written Coachings.

The Branch was fully staffed as of February or March 2006, which would allow Plaintiff to concentrate on her responsibilities as Office Manager. Queer Depo. at pp. 40-44. However, despite being fully staffed, Plaintiff continued to fail to meet her monthly goals. Queer Depo. at p. 46. Plaintiff does not dispute that she consistently failed to meet her goals. Id. at 46 and 143.

The Bank followed a Performance Management System, contained in the Employee Handbook, to address employee performance deficiencies. In May, June, July, August and September 2006, Sargent gave Plaintiff written "Coaching Plans," documenting Plaintiff's unacceptable performance and offering advice as to how she could meet her goals.[3] Queer Depo. at pp. 54, 63-64, 101-02, 107-08, 121, and 140-42; Exhibits F, G, J, K and M. Sargent followed up by e-mail, offering concrete suggestions as to how Plaintiff should proceed. Queer Depo. at pp. 111-16; Exhibit K. Sargent bought Plaintiff a special phone cord to set up a space for her in the back room where she could make calls to potential customers uninterrupted, first thing in the morning. During these months, her goals were lowered by Sargent, but Plaintiff failed to

---

[3] Plaintiff conducted only one Work Perk presentation independent of Sargent during the entire time she was employed at the Branch. Queer Depo. at p. 120-21. In the beginning, her monthly goal for Work Perk presentations was 5, which Sargent eventually reduced to 4, and then reduced to 3. Plaintiff also repeatedly fell short of her loan production goals, procuring zero or one loan each month, with a goal of 4 per month. Relative to her other monthly goals for checking, savings and credit card accounts, Plaintiff's results varied – sometimes reaching or exceeding her target numbers, while other times falling short. Queer Depo. at pp. 54, 56-57, 63,101-02, 105-06, 108, 112-14, 121, 132-46, 152-54, and 156-59; Queer Depo. Exhibits F, G, J, K, L, M, N, O, and P.

improve. Queer Depo. at p. 101-03. Plaintiff was repeatedly informed that she needed to improve; that the failure to improve could result in discipline or termination; and, testified during deposition that she understood improvement was expected.

Plaintiff was given the opportunity to comment, in writing, on each of her written Coaching Plans, but declined to do so. Queer Depo. at pp. 59-60, 64, 143. Plaintiff stated during deposition that she didn't think the Coaching Plans were a "big deal" and that she and Sargent often joked about her inability to meet her goals.[4] Queer Depo. at pp. 58, 60, 64 and 106.

On August 4, 2006, in addition to a written Coaching Plan, Plaintiff was also given a "Directive Counseling," listing specific performance deficiencies that needed to be addressed. Id. at 144-47, Exhibit N. Plaintiff testified that she understood the seriousness of the requests being made and it was clear to her that she needed to meet her objectives to keep her job. Id. The document gave her specific directives as to how to achieve her monthly goals and gave directions for follow-up on a daily basis. Plaintiff understood the next step was probation. Id.

**C.  Communication with District Manager Drew Martin.**

Martin took over as District Manager in February or March 2006 and alleges that although it wasn't his job to have Coaching sessions with Plaintiff, he had regular conversations with Plaintiff regarding her performance prior to her termination in October 2006. Martin Depo. at 7-9.

Plaintiff was required to call Martin evenings when the Branch closed to report her

---

[4] Plaintiff blames her inability to meet the goals on the fact that she worked had to work the "teller line" and that the Branch failed an audit in March 2006 which created additional work for her. However, there is no dispute that the Branch was fully staffed as of February or March, and audit duties were part of the Office Manager's assigned duties.

progress toward meeting her goals, but didn't always do so when she had other work to do at the Branch.  Queer Depo. at p. 122-23.   Further, Plaintiff was expected to take part in weekly and monthly conference calls.  Plaintiff failed to participate in many of the required calls without notice.  Queer Depo. at pp. 121-37, Exhibit L.

On July 26, 2006, Martin sent Plaintiff an e-mail.  Id.   The Subject Line reads "Consumer Lending Specialist Absent."  Id.  The e-mail was related to the monthly telephone conference for Lending Specialists.  Id.  Martin commented that Plaintiff was not on the monthly call and requested updates as to whether she was working to meet her goals.  Martin instructed her to keep him informed of her progress going forward; instructed her to contact him if she would not be on future calls; and, indicated that her failure to participate as required indicated a disinterest in the objectives of the Branch and District.  Id.  Plaintiff is not sure whether she responded to the e-mail and is not sure she called Martin to inform him before missing later conference calls.  Id.  Plaintiff was directed in her August 1, 2006 Coaching Plan to call her numbers in to Martin every Tuesday and Thursday at 4:30.  Id. at 142-43.

### D.  Large Losses

Plaintiff was involved in two, large losses at the Chapel Hill Branch.  The Bank defines a large loss as being a loss between $10,000 and $50,000.  Martin Depo. at pp. 18-19, 56.  Under the Bank's policy, an employee responsible for an unrecovered large loss is subject to termination.  Id.

#### 1.  June 16, 2006.

On June 16, 2006, Plaintiff was responsible for a potential loss of $24,000.  Queer Depo. at pp. 66-72, Exhibit H.  A relative of Plaintiff's ex-husband deposited a check at the Chapel Hill

-6-

Branch in the amount of $24,000.00. Queer Depo. at 68. Plaintiff entered the transaction into the Bank's computer system with a "split deposit" – deposit, cashier's check and cash back – so as to avoid the "hold" that the Bank's computer system would typically place on such a large amount. Id. at pp. 67, 69-70, Exhibit H. In essence, Plaintiff issued cash without allowing the deposited check to clear first. The deposited check was returned because it was drawn against an account with insufficient funds. Id. at pp. 67-68. Plaintiff did not consult anyone at the Bank about avoiding the hold with respect to this check and is not aware of any Bank policy that allowed her to remove a hold. Id. at pp. 71-72. She believed, based on her banking experience, that she had discretion to remove a hold. Id.

Over a period of several weeks, the Bank's Loss Prevention Department made several calls to the customer; sent him a letter; and, eventually recovered the funds. Queer Depo. at pp. 72-74, Exhibit H.

    **2.  June 27, 2006.**

On June 27, 2006, the Branch had a second large loss, as a result of Plaintiff releasing a 45-day hold on a counterfeit check drawn on a Canadian Bank. There is conflicting testimony regarding the moments leading up to Plaintiff's decision to release the hold. It is undisputed that Plaintiff approached Sargent, who was at the Bank meeting with District Manager Martin, asking for information on the 45-day hold. Sargent Depo. at p. 35. Neither Plaintiff nor Sargent were familiar with a 45-day hold, and neither understood why at 45-hold had been placed on the check. Sargent did not personally handle the transaction, but testified that he told Plaintiff to do her due diligence; examine why there was a hold; check the Comments Section of the Account Screen; and, then she could release the hold if there was no reason to hold the money. Sargent

Depo. at pp. 36, 38, 58 and 84.  However, Plaintiff testified that Sargent told her to remove the hold on the check because the funds were "collected."  Queer depo. at p. 84, 89-90.  Sargent denies he told Plaintiff to release the funds.  Sargent Depo. at p. 28.

There is no dispute that Plaintiff removed the hold on the check, allowing the customer to withdraw the funds.  Queer Depo. at pp. 84-98.  Plaintiff did not check the Comments Section of the Account Screen prior to releasing the hold, which included an explanation for the 45-day hold.  Plaintiff did not call the Retail Help Line to assist her with the transaction.  Id. at pp. 25, 84, 93-95, 98, 168-69; Sargent Depo at pp. 51-52, Exhibit 2; Martin Depo. at p. 45, Exhibit 2; Declaration of Drew Martin at ¶ 7.  The check was later determined to be counterfeit.

On July 11, 2006, Martin notified the Loss Prevention Department of the loss and it began an investigation and collection efforts.  Martin Declaration at ¶ 7, Exhibit B; Martin Depo. at pp. 17-18, 23, Exhibit 5.  A portion of the money was returned.

**E.     Probation**

As stated above, Plaintiff was given her last Coaching Plan in September 2006.  Sargent gave her the September Coaching Plan after consulting with Martin and the Human Resources Department.  The Plan noted insufficient loan application volume; failure to make sales calls; failure to meet loan production goals; and, unacceptable Work Perk activity.  Sargent Depo. at p. 57; Queer Depo. at pp. 156-59, Exhibit O.  The Plan noted that her Work Perk goal had then been reduced to three.

That same day, Plaintiff also received a Disciplinary Counseling and Probationary Notice.  Plaintiff does not dispute the accuracy of the performance issues listed on the Probation Notice.  Queer Depo. at pp. 159-60, Exhibit P.  Plaintiff was informed she was subject to a 90-day

probationary period, during which time she was required to "demonstrate immediate, continuous and sustained improvement" or risk termination. Plaintiff understood that the Bank could terminate her employment prior to the expiration of the ninety-day probationary period if her performance did not improve. Id.

Plaintiff testified during deposition that when she was placed on probation, Sargent verbally told her that she could be terminated because the Bank did not recover $17,871.68 of the loss resulting from the late June 2006 transaction. Id. at pp. 161-62, 175. Plaintiff testified that she told Sargent at that time that he had directed her to remove the hold and that in response Sargent told her that she was the one who removed the hold. Id.

**F.     Leave**

Within a day of receiving the Probationary Notice, Plaintiff went on leave.[5] Queer Depo. at p. 171. On September 22, 2006, while she was on leave, and at Plaintiff's request, District Manager Martin met with her at a local restaurant to discuss the June 27, 2006 loss. Queer Depo. at 167.

Plaintiff expressed concern to Martin that Sargent indicated she would be terminated for the $17,871.68 loss. According to Martin, Plaintiff told him that she released the hold on the counterfeit check without reading the Comments Section on the Account Screen and without consulting the Bank's Retail Help Line. Martin claims Plaintiff told him that Sargent instructed her to review the hold and check the Comments Section on the Account Screen in order to determine whether the hold could be released. Martin Depo. at pp. 46 and 54, Exhibit 6.

---

[5]

During deposition, Plaintiff indicated that Sargent let her take a week of unplanned vacation to allow her to look for a job. Later she requested FMLA leave, which was not granted. Queer Deposition at pp.171-187.

Martin, who had previously consulted with the Human Resources Department, informed Plaintiff that she would be terminated because of her responsibility for the $17,871.68 loss. Queer Depo. at pp. 167-68; Martin Depo. at pp. 6 and 64; Martin Declaration at ¶ 8.[6] During his deposition, Martin testified that Plaintiff could have been terminated based on her performance, independent of the loss. Martin Depo. at p. 46. Martin testified that Plaintiff's performance during her time at the Branch was "woefully deficient" and he stated that she "did not fulfill the basic obligations of her duties." Martin Depo. at p. 8. Martin cited Plaintiff's poor performance; lack of due diligence; and, the large monetary loss as precipitating her termination. Id. at 16.

### G. Termination.

On October 19, 2006, Plaintiff returned to work and Martin terminated her employment.

## II. Procedural History.

### A. Complaint.

Plaintiff originally filed this action against Defendant in the Summit County, Ohio, Court of Common Pleas, Case No. CV-2010-10-6690. On November 5, 2010, Defendant filed its Notice of Removal (Diversity Jurisdiction). (Docket #1.)

The Complaint includes four counts: Count I – Age Discrimination in violation of Ohio Rev. Code § 4112.14; Count II – Gender Discrimination in violation of Ohio Rev. Code §

---

[6]

In his Affidavit, Martin states, "Upon learning that the loss would not be recovered, and based upon the fact that Queer was on probation regarding her continuous and admitted performance deficiencies, in consultation with [National City Bank's] Human Resource Department, the decision was made to terminate her employment." Martin Affidavit at ¶ 8.

-10-

4112.02(A); Count III – Retaliation in violation of Ohio Rev. Code § 4112.02(I); and, Count IV – Disability Discrimination in violation of Ohio Rev. Code § 4112.02(A). As noted in the opening to her Brief in Opposition to Defendant's Motion for Summary Judgment, Plaintiff has abandoned all of the claims except for Count II, alleging gender discrimination.

As the basis for her gender discrimination claim, Plaintiff's Complaint reads, in pertinent part, as follows:

> 7. At all relevant times, PNC's Chapel Hill branch Manager was [male, under forty years of age, non-disabled and with no history of engagement in protected activity] defendant Brian Sargent ("Sargent").
>
> 8. At all relevant times, Plaintiff was obliged to follow the work directives of Sargent.
>
> 9. Beginning in approximately 2006, on multiple occasions, Plaintiff and Sargent were the only PNC employees staffing the Chapel Hill PNC branch.
>
> 10. Also during 2006, Plaintiff was routinely required to work the teller line at the Chapel Hill branch, by Sargent, but was not provided the training or compensation afforded other tellers not of her protected class status.
>
> 11. Throughout the time Sargent supervised Plaintiff, she was repeatedly subjected to different and less favorable treatment and performance standards than PNC personnel not of her protected class status, by defendant.
>
> 12. At all times relevant, Plaintiff reported her concerns about working the teller line to PNC management, to no avail.
>
> 21. At all relevant times, defendant treated Plaintiff differently and/or less favorably than employees not of plaintiff's actual and/or perceived protected class status; and all contrary claims are false and pretextual.
>
> 22. In about September 2006, Plaintiff informed Brian Sargent's supervisor [male, under forty (40) years of age, non-disabled and with no known history of engagement in protected activity], Drew Martin, that she was being threatened and treated differently and badly, by Brian Sargent.
>
> 23. At all relevant times, defendants failed to take prompt and/or effective investigative or corrective action, upon Plaintiff's reports of disparate/unfair

>
> treatment in her PNC employment.
>
> 24. At all relevant times, Plaintiff was subjected to different performance standards than PNC employees not of her actual or perceived protected class status; and all contrary claims are false and pretextual.
>
> 25. On about October 18, 2006, Plaintiff was fired from PNC because of . . . her gender . . .
>
> 26. Plaintiff was replaced by, and/or her termination permitted the retention of persons outside her actual or perceived protected class status.

In her Complaint, Plaintiff appears to assert that she was treated differently than other Branch employees by Sargent and Martin because she is female; that she was not given adequate training or compensation, when compared to other, non-female tellers; and, that she was subject to different performance standards than non-female employees. Finally, Plaintiff asserts that she was terminated because of her gender, so that the Bank could continue to employ men.

### B. Defendant's Motion for Summary Judgment.

Defendant filed its Motion for Summary Judgment on September 16, 2011. (Docket #26.) Defendant states that Plaintiff failed to establish that the Bank's reasons for her discharge – her poor performance and documented losses – were a pretext for gender discrimination. Further, Defendant argues that Sargent is not similarly situated to Plaintiff and that Plaintiff's subjective belief and assumption that the Bank discharged her instead of Sargent because she is a woman is not evidence of discrimination.

On October 19, 2011, Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment. (Docket #31.) Plaintiff's allegations of gender discrimination have undergone a make-over since the time she filed her Complaint. Plaintiff turns the focus to Sargent and his performance at the Branch. Specifically, Plaintiff points out that Sargent was not disciplined or

-12-

terminated, despite the fact that he was given a Directive Counseling in March 2006 which noted certain deficiencies related to the failed March 2006 Branch audit; that his 2006 year-end evaluation noted areas in which he need to improve;[7] and, that the Branch was underperforming in March 2006.  Further, Plaintiff alleges that Sargent was partly responsible for the June 26, 2006 Bank loss, asserting that Sargent told her to "just go ahead and remove the hold," but he was not terminated.

In addition to the foregoing, Plaintiff repeatedly mentions that her failure to meet her goals was the result of working the teller line and attending to the March 2006 audit issues and that she and Sargent joked about her poor performance.

On October 27, 2011, Defendant filed its Reply Memorandum.  (Docket #32.)  Defendant points out that the Branch was fully staffed as of February 2006 and that Plaintiff was not reprimanded for her performance until after that time.  Defendant states that Plaintiff's attempt to salvage her claim by asserting Sargent is also responsible for the June 27, 2006 loss has no basis in fact.  Plaintiff admitted during deposition that regardless of whether Sargent instructed her to release the hold, it was her responsibility to ensure that losses did not occur as a result of transactions she performed and she was responsible for releasing the hold on the counterfeit check without checking the Comments Section of the Account Screen.  Queer Depo. at pp. 91, 95, 97, 168, and 214; Martin Depo. at 46, 54, Exhibit 6.

In addition to the foregoing, Defendant restates its argument that Plaintiff has failed to

---

[7] On March 7, 2007, Sargent received his 2006 Performance Appraisal and Development Plan.  Sargent Depo. Exhibit 4.  Overall, Sargent's Performance Rating was "Achieves Expectations."  The Performance Appraisal noted several areas in which he performed well and others in which he needed to improve.  Id.

demonstrate pretext, given that Plaintiff's performance was documented to be deficient over the course of several months and she was responsible for two separate losses.  Finally, Plaintiff notes that Sargent is not similarly situated to Plaintiff.  Sargent and Plaintiff held different positions at the Branch; had different responsibilities; and, Sargent did not have comparable, long-term performance issues at the Branch.

**II.      Summary Judgment Standard.**

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

**III.     Discussion.**

The Court has thoroughly and exhaustively reviewed all of the claims raised by Plaintiff in this action; Defendant's Motion for Summary Judgment; and, all supporting documentation, including a detailed analysis of the deposition testimony and evidentiary materials submitted by both Parties.  Reviewing Defendant's summary judgment motion in the light most favorable to Plaintiff, there are no genuine disputes as to any material facts in this case and Defendant is entitled to summary judgment as a matter of law as to all of Plaintiff's claims.

Plaintiff brings her gender discrimination under Chapter 4112 of the Ohio Revised Code. In evaluating discrimination claims under Chapter 4112, Ohio courts look to Federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and apply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), burden- shifting framework. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E. 2d 128, 131 (Ohio 1981). Under the *McDonnell Douglas* burden-shifting framework "[t]he burden is first on the plaintiff to demonstrate a prima facie case of [] discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 2009 WL 2851351 (6th Cir. 2009).

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that

-15-

the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination." *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2008). "An employer may make employment decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

Even assuming Plaintiff has satisfied the elements of a prima facie case of gender discrimination (although whether or not Mr. Sargent is similarly is situated to Plaintiff is questionable), Plaintiff has failed to demonstrate pretext.  Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

Plaintiff's conduct resulted in two major losses for the Branch.  In both instances, Plaintiff failed to follow established bank procedures.  While there is disputed testimony relative to the loss incurred in late June 2006, Plaintiff admits to removing the hold on the counterfeit check without performing due diligence.  Further, Plaintiff's deficient performance at the Branch was well-documented and Plaintiff admitted she was performing below expectations.  Plaintiff consistently blamed her failure to perform on understaffing at the Branch, but the Branch was fully staffed in February or March 2006.  Plaintiff was furnished with Written Coachings regarding her failure to meet her goals May through September 2006.  Sargent lowered Plaintiff's monthly goals and offered her suggestions for meeting those goals, but her performance never improved.  Plaintiff was placed on probation and knew that her deficient performance could result in discipline or termination.  Plaintiff's performance and conduct was sufficient to justify

her termination.

Plaintiff has not come forth with any evidence whatsoever that would prove the Defendant's articulated nondiscriminatory justification for her termination was not true, nor has she presented evidence to support her claim that she was terminated instead of Sargent because she is a woman.  During her deposition, Plaintiff testified as follows:

> Q: Do you know, as you sit here, why you believe you were discriminated against?
> A: I feel that I got fired for doing something my boss told me to do, and that I took the fall for it.  And I think I took the fall for it because I'm a grown woman with no children, no responsibilities, versus he has a young family and a family he needs to support.
> \* \* \*
> A: I just feel like one of us had to go, and it was probably easier for me to get along since I didn't have a family to support and to find – be able to find another job and support myself than it would be for him as a family man to do that.
> \* \* \*
> Q: You have also claimed sex discrimination in this matter.  What is the factual basis for your claim of sex discrimination?
> A: Well, it's all the guys that are at our branch now at the Chapel Hill Branch now, and back to what I answered earlier, I feel that it's still considered male to be the head of the household to bring in the income, and since he was the male, he kept his job and I lost mine.
> Q: Is there any other fact upon which you believe or you base your claim of sex discrimination in this matter?
> A: No.

Queer Depo. at pp. 193-94 and 215-16.  This is insufficient to establish pretext.

Further, arguing that the Bank should also have terminated Sargent does not establish pretext, as an employer's business judgment is not a valid method for establishing pretext. *Brocklehurst v. PPG Industries, Inc.*, 123 F.3d 890, 898 (6th Cir. 1997).  The Court recognizes that Sargent was given a written Coaching Plan in March 2006 as a result of Branch Audit and that his 2006 Performance Evaluation, on which he received an overall performance rating of

-17-

"Achieves Expectations," noted specific areas of necessary improvement. However, this does nothing to support Plaintiff's claim that she was treated differently because she is a woman.

Aside from Plaintiff's unsubstantiated statements, there is absolutely nothing in the record to suggest Plaintiff was subject to different standards than Sargent or any other Bank employee, because she is female; disciplined more harshly than Sargent or any other bank employee because she is female; or, terminated instead of Sargent or any other bank employee because she is female.

**IV.    Conclusion.**

Defendant is entitled to summary judgment as to all of Plaintiff's claims. The Motion for Summary Judgment Filed by Defendant (Docket #26) is hereby GRANTED. This case is hereby TERMINATED.

IT IS SO ORDERED.

                                               /s/Donald C. Nugent
                                               DONALD C. NUGENT
                                               United States District Judge

DATED:    December 7, 2011